UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
KIND LLC,                                           :
                                                    :
                              Plaintiff,            :          14 Civ. 770 (KMW) (RLE)
                                                    :          OPINION & ORDER
              -against-                             :
                                                    :
CLIF BAR & COMPANY,                                 :
                              Defendant.            :
-----------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

Plaintiff KIND LLC ("Plaintiff" or "KIND") has moved pursuant to Rule 65 of the

Federal Rules of Civil Procedure for a preliminary injunction against Defendant Clif Bar &

Company ("Defendant" or "Clif Bar").  KIND seeks to prevent Clif Bar from using a new trade

dress for its MOJO bars that KIND alleges infringes upon the distinctive trade dress of KIND

bars.  For the reasons set forth below, the Court DENIES Plaintiff's motion.

**I.     Background**

Both KIND, founded in 2004, and Clif Bar, found in 1992, produce healthy snack bars.

(Lubetzky Decl. ¶ 2, 3 [Dkt. No. 11]); (Cleary Decl. ¶¶ 2, 15 [Dkt. No. 32]).  KIND sells KIND

bars, (Lubetzky ¶ 2), while Clif Bar sells an array of different bars, including the Clif MOJO bar,

at issue here, (Cleary Decl. ¶ 2).  KIND argues that Clif Bar's new trade dress for its MOJO bar

mimics several key elements of the KIND trade dress, which it defines as:

> (1) packaging with a transparent, rectangular front panel revealing a
> large portion of the bar itself; (2) a horizontal stripe bisecting the
> transparent front panel containing the flavor of the bar in text; (3) a
> text description of the product line (e.g. "Fruit & Nut," "Plus," or
> "Nuts & Spices") in line with the horizontal stripe bisecting the
> transparent front panel; (4) a vertical black band, offset to the side
> of the package, containing a bulleted list of many of the bar's key
> healthful attributes; (5) opaque vertical bands, or end caps, at either
> edge of the product package; and (6) a 40g size, in a slender shape.

(Lubetzky Decl. ¶ 20); (Mem. of Law in Supp. 2–3 [Dkt. No. 9]).[1]

## II.   Discussion

"The District Court may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (internal quotation marks omitted).  In addition, the "court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor" and "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotation marks omitted).

The Court finds that Plaintiff has failed to establish a likelihood of success on the merits, or irreparable harm, or that the balance of hardships tips decidedly in its favor.  The Court therefore DENIES Plaintiff's motion.

---

[1] In its post-hearing reply papers, KIND writes that "[a]lthough KIND pointed out the six specific elements that directly contribute to the overall infringing impression created by the MOJO wrapper, it has consistently argued that it is ultimately the ***overall*** impression of the packaging, rather than the individual elements, that is at issue." (Post-Hrg. Reply Mem. of Law 2 [Dkt. No. 73]).  To the extent that KIND seeks to protect something more than the six elements it has articulated as its trade dress, the Court rejects KIND's attempt.  As explained by the Second Circuit:

> [F]ocus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.

*Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)

A.  *Likelihood of Success on the Merits*

A product's trade dress is protected by section 43(a) of the Lanham Act, which provides a cause of action against any person who "in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person."  15 U.S.C. § 1125(a).  A trade dress that is functional is not protected by the Lanham Act.  *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 (2d Cir. 1998).

In order to succeed on a trade dress infringement claim, the plaintiff must show that (1) its trade dress is protectable due to the dress's (a) inherent distinctiveness or (b) acquisition of secondary meaning, and (2) likelihood of consumer confusion.  *Id.*  The Court finds that Plaintiff has failed to meet either test.

1. Inherent Distinctiveness or Secondary Meaning

i.  **Distinctiveness**

A product's distinctiveness is evaluated using the test set out by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir. 1976).  *See Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) (adopting *Abercrombie* test to evaluate distinctiveness of a product's trade dress).  Under this test, a trade dress is classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.  *Id.*  A generic trade dress is never protectable.  *Id.*  A descriptive trade dress is protectable if the plaintiff establishes that it has acquired secondary meaning.  *Id.*  A suggestive or arbitrary or fanciful trade dress is always inherently distinctive.  *Id.*  "The Supreme Court has emphasized that an inherently distinctive trade dress is one whose

intrinsic nature serves to identify a particular source of a product, although it may not yet have widespread identification among consumers." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) (internal citation and quotation marks omitted).

"Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995). However, "the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable . . . to avoid tying up a product or marketing idea." *Id.* The Second Circuit has cautioned that in evaluating a trade dress' distinctiveness, courts should bear in mind two considerations: First, "overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." *Id.* Second, "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Id.*

KIND argues that its trade dress is distinctive because the trade dress is "unique, arbitrary, and inherently distinctive." (Mem. of Law in Supp. 7). KIND relies on Second Circuit case law stating that, "the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited. As a consequence, a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection." *Fun-Damental Too, Ltd.*, 111 F.3d at 1000. Clif Bar argues that KIND's trade dress is generic. (Mem. of Law in Opp. 11 [Dkt. No. 31]). The Court disagrees with both parties.

The Court finds that "despite the tendency for trade dresses to be inherently distinctive because the whole universe of materials and designs is available for packaging," Plaintiff's very

common packaging design is not inherently distinctive.  *Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 489 (S.D.N.Y. 1998) (Newman, J.).  Many food bars, in addition to KIND and MOJO bars, use one or more of the six elements that KIND seeks to protect here as its trade dress.  *See* (DX 66 (food bars in transparent packaging)); (Grant Decl. ¶¶ 6, 8, 13, 17, 19, 20 (food bars using horizontal banners containing product and/or flavor descriptions), ¶¶ 8–9, 12, 14–17, 24, 29–31 (food bars declaring product attributes along one side of front panel); ¶¶ 6–8, 12, 15, 19–23, 25–27, 30 (food bars that are 40 grams in size) [Dkt. No. 34]); (Cleary Decl. ¶¶ 39–40 (use of transparent packaging in food industry in general and by other food bar packagers), ¶¶ 47–49 (use of opaque end caps in other Clif Bar products, common use of bullet points in consumer packaging, common practice of labeling products as "gluten free")); (Rosen Decl. ¶¶ 4–12 (use of transparent packaging in food industry in general and in Clif Bar products), ¶ 17 (use of transparent packaging by other manufacturers of food bars), ¶ 22 (use of opaque end caps in virtually all Clif Bar products and bars made by third-parties) [Dkt. No. 33]).  Most of the six elements also serve functional purposes (e.g., the transparent window serves the purpose of revealing the bar within; the text description serves the purpose of informing the consumer of the bar's ingredients, etc.), which also militate against finding that the KIND trade dress is protectable.  *Jeffrey Milstein, Inc.*, 58 F.3d at 32.  Moreover, the six elements, either individually or together, do not serve to identify the source of the bar.  *Fun-Damental Too, Ltd.,* 111 F.3d at 1000.  Notably, the only element of KIND's packaging that indicates its source, the KIND logo, is not included in the trade dress KIND seeks to protect here.

The Court finds that KIND's packaging is also not generic.  "An otherwise protectable trade dress can become generic within a particular market if the design becomes a standard or

custom for the industry." *Regal Jewelry Co., Inc.*, 999 F. Supp. at 489.  The Court does not believe that the six elements combined have become "a singular custom in the industry."  *Id.*

The Court finds that KIND's trade dress is more appropriately deemed descriptive; the elements KIND seeks to protect here all describe its product.  *See Med. Econ. Co., Inc. v. Prescribing Reference, Inc.*, 294 F. Supp. 2d 456, 463 (S.D.N.Y. 2003) (Daniels, J.) ("Descriptive marks are marks that describe a product or its attributes.").  The most prominent feature of the trade dress is the "transparent, rectangular front panel *revealing a large portion of the bar itself*."  (Lubetzky Decl. ¶ 20 (emphasis added)).  Two other prominent elements that describe the product are the "text description of the product line . . . in line with the horizontal stripe bisecting the transparent front panel," (*id.*), and the "40g size, in a slender shape," (*id.*).  The other features of the trade dress also describe the product in some way.  The horizontal stripe bisecting the transparent front panel "contain[s] the flavor of the bar in text."  (*Id.*).  The vertical black band "contain[s] a bulleted list of many of the bar's key healthful attributes."  (*Id.*).  The only element that might not seem descriptive at first are the opaque end caps; however, the Court notes that the colors of KIND bars's opaque end caps sometimes reflect the flavor of the bar, or feature plus signs to reflect the bar's status as part of KIND's "Plus" line.  *See, e.g.*, (DX 91-L (blueberry vanilla & cashew KIND bar with blue end caps)); (DX 91-I (almond & apricot KIND bar with apricot-colored end caps)); (DX 25-A (peanut butter & strawberry KIND bar with light-brown colored end caps)); (DX 91-E–G (KIND "Plus" bars with end caps featuring plus signs)).[2]

ii.  **Secondary Meaning**

---

[2] KIND has secured two registrations with the United States Patent and Trade Office for its packaging, Reg. Nos. 3,882,221 and 4,097,493.  KIND also argues that its trade dress is prima facie protectable as a consequence of these registrations.  (Mem. of Law in Supp. 7–8 [Dkt. No. 9]).  This argument is unavailing.  The trade dress that KIND seeks to protect here is different from the trade dress covered by its registrations.  For example, both registrations include the word "KIND" and the four bars above it, but the trade dress KIND seeks to protect here does not include either of those elements.

"When trade dress is descriptive, it must have obtained secondary meaning with consumers at the time of the alleged infringement in order to be protectable." *Regal Jewelry Co., Inc.*, 999 F. Supp. at 490 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). "The trade dress of a product attains secondary meaning when the purchasing public 'associates' its design with a single producer or source rather than simply with the product itself." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Id.* at 169. "[A] party seeking to prove secondary meaning has a heavy burden . . . ." *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987) (internal quotation marks omitted). Factors that are relevant in determining secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir. 1996) (internal quotation marks omitted). No single factor is determinative and not all factors need to be proven. *Id.* The Court finds that KIND has failed to meet its heavy burden of establishing that its trade dress has acquired secondary meaning.

It appears from Clif Bar's internal documents during the MOJO redesign period that Clif Bar deliberately copied elements of the KIND trade dress for its new MOJO trade dress and therefore the "attempts to plagiarize the dress" factor weighs in favor of KIND. *See, e.g.*, (Baxter Decl. Ex. A (email recapping a MOJO redesign meeting stating that, "[e]veryone also agreed that Kind is a best in class packaging that we should learn from for MOJO" and listing the following "learnings": (1) "[l]arge product visual with clear window"; (2) "[g]ood branding (KIND);" (3) "[c]laims on front panel (not wrapped); and (4) "[g]ood flavor communication

claim"); Ex. B (internal Clif Bar PowerPoint finding that KIND has an "advantage" in packaging because of its "large clear window" and because its "claims are clearly indicated on the front wrapper"); Ex. C (email instructing a team member to "[b]ring multiple KIND bars" to a MOJO redesign meeting); Ex. E (Mojo 2013 Refresh Packaging Brief listing as "[c]onsiderations" that packaging should "[i]nclude a large clear window so that ingredients can be visible" and "[c]laims . . . should be on the front of the wrapper"); Ex. F (excerpt from a PowerPoint presentation titled "Mojo Packaging Refresh," listing as a "packaging objective[]" to "[c]ompete head-to-head with Kind" by incorporating a "[l]arger window to showcase bar with whole pieces of fruits & nuts" and "[s]imilar window shape & coloring to Kind"); Ex. G (email from Kim Dao, Brand Manager, with the subject "Mojo Creative Weekly 7/9 RECAP," stating that the MOJO packaging is "now too close to KIND") [Dkt. No. 45]).[3]

KIND argues that the following factors also weigh in favor of finding that its trade dress has acquired secondary meaning: since the product's launch, KIND (1) has spent more than $100 million on marketing and advertising, (Lubetzky ¶ 13); (2) has sold $600 million dollars' worth of KIND bars, (*id.* ¶ 16); (3) has received extensive unsolicited media coverage, (*id.* ¶ 17); and (4) all KIND bars have shared the six elements KIND seeks to protect here, (*id.* ¶ 3).  However, KIND fails to establish that its sales, marketing and advertising expenditures, and unsolicited media coverage have resulted in consumers associating the six elements it seeks to protect as its trade dress with KIND.  *Cf. Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d at 168. The trade dress KIND seeks to protect here excludes its logo, and KIND has not shown that its packaging, without the logo, has acquired secondary meaning.  The Court notes that even the four advertisements KIND submitted that featured KIND bars without the KIND logo, PX 200–

---

[3] The Court recognizes, however, that some of the elements that Clif Bar identified as KIND's trade dress are not part of the trade dress KIND seeks to protect here (e.g., the "[g]ood branding (KIND)").

03, displayed the KIND logo elsewhere on the advertisement. *Cf. Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 249 (S.D.N.Y. 1999) (Sprizzo, J.) (finding that perfume bottle had not acquired secondary meaning partly because there was no evidence of "what percentage of magazine ads contained the . . . perfume bottle or what percentage of television or black and white ads contained the perfume bottle"). As a result, it is impossible for the Court to determine whether secondary meaning has been acquired by (i) the six elements KIND seeks to protect here as its trade dress, or (ii) KIND's trademarked logo, or (iii) the combination of the logo and the six elements.

Although "intentional copying constitutes persuasive evidence of consumer recognition, conscious replication alone does not establish secondary meaning." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc*., 933 F.2d at 169 (internal citation omitted). The Court finds that KIND has failed to establish that its trade dress has acquired secondary meaning.

## 2. Likelihood of Consumer Confusion

In determining the likelihood of consumer confusion, district courts examine the eight factors in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), which are: "(1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group." *Fun-Damental Too, Ltd.*, 111 F.3d at 1002–03. No single factor is dispositive and the factors are not exclusive. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). Based on the evidence presented, the Court finds that most of the *Polaroid* factors and additional marketplace factors weigh in favor of Defendant.

i.   **Strength**

The strength of a trade dress is its "tendency . . . to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Fun-Damental Too, Ltd.*, 111 F.3d at 1003 (internal quotation marks omitted).  This analysis turns on a number of factors, including the classification of the trade dress on the *Abercrombie* spectrum and the existence of secondary meaning; however, "the essence of the analysis is to determine the strength of the trade dress in its commercial context."  *Id.*  "Even an inherently distinctive [trade dress] can, in its commercial context, lack strength as a [trade dress]."  *Nora Beverages, Inc.*, 269 F.3d at 123.  "The use of part or all of the [trade dress] by third parties weakens its overall strength."  *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999).  For the reasons stated below, the Court finds that the KIND trade dress is weak.  This factor weighs in favor of Defendant.

a.   Abercrombie *Spectrum and Secondary Meaning*

As discussed above, KIND's trade dress is descriptive and has not acquired secondary meaning.  Therefore the trade dress is not inherently distinctive.  This weighs in finding that the trade dress is weak.

b.   *Commercial Context*

As described above, many food bars use the elements KIND seeks to protect as its trade dress, either individually or by using some elements in combination.  This also undercuts the strength of the KIND trade dress.  *See Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d at 118; *see also P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 668 (S.D.N.Y. 1985) (Leisure, J.) (concluding that a trade dress was "weak" because "its main features are used by a not inconsiderable number of other companies for other products").

That many products share some of the elements KIND seeks to protect here as its trade dress also "indicate[s] that its claim is pitched at an improper level of generality." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997).  KIND has too broadly defined its trade dress, making it difficult for the Court and other bar manufacturers to determine what KIND seeks to protect and what KIND believes infringes.  For example, Mr. Lubetzky, KIND's CEO, testified that the Think Thin Crunch bar "may arguably be infringing" as well, (Lubetzky Reply Decl. ¶ 16 [Dkt. No. 41]), but most of the six elements KIND seeks to protect here as its trade dress do not appear on the trade dress of the Think Thin Crunch bar, (DX 52-F–J).[4]  The only similarities between the trade dress of the Think Thin Crunch bar and the trade dress that KIND seeks to protect here are the transparent window and the opaque end caps.  It appears then that KIND impermissibly seeks protection for "a generalized type of appearance." *Jeffrey Milstein, Inc.*, 58 F.3d at 32.  Allowing KIND to protect an overly broad trade dress would go against the Second Circuit's admonition that courts should be careful not to overextend trade dress law and that trade dress law does not "protect an idea, a concept, or a generalized type of appearance." *Id.*

Based on the above, the Court finds that the KIND trade dress is weak.  The trade dress, taken as a whole and in its commercial context, does not indicate the source of the product.  This factor weighs in favor of Defendant.

ii. **Similarity**

---

[4] The trade dress of the Think Thin Crunch bar does not have "a horizontal stripe bisecting the transparent front panel containing the flavor of the bar in text," "a text description of the product line (e.g. 'Fruit & Nut,' 'Plus,' or 'Nuts & Spices') in line with the horizontal stripe bisecting the transparent front panel," or "a vertical black band, offset to the side of the package, containing a bulleted list of many of the bar's key healthful attributes."  It arguably does not even have "a 40g size, in a slender shape," because although the bar weighs 40 grams, it is not slender.

In evaluating similarity, the Court must consider whether the two products "create the same general overall impression."  *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979).  "The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses.  When prominently displayed it can go far towards eliminating any possible confusion . . ."  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc*., 973 F.2d 1033, 1046 (2d Cir. 1992); *see also Nora Beverages*, 164 F.3d at 744 ("[T]he likelihood of confusion analysis must consider the elements for which protection is claimed in the context of the entire trade dress.  Therefore, Nora can claim protection for its bottle shape if it is distinctive and non-functional, but defendants' labels must be considered in the . . . analysis." (internal citation omitted)).  The Court finds that although the two trade dresses share some similar elements, the overall impression of the KIND trade dress differs significantly from the MOJO trade dress.  This factor weighs in favor of Defendant.

As explained by Mr. Lubetzky, the packaging of most brands can be categorized "into two types of motifs."  (Tr. 118:17 [Dkt. No. 63]).  One motif is packaging that emphasizes "straight lines" and "minimiz[es] curvature," and the other motif is packaging "which has some elements of curvature, either dominant or some degree."  (*Id.* 118:21–23).

KIND's trade dress is best described as "minimalist," (*id.* 41:8), "simple," (*id.* 41:11) "clean," (*id.* 150:4), "modern,"  (*id.* 118:6–9); (Lubetzky Decl. ¶ 9), and "sleek," (Tr. 118:6–9); (Lubetzky Decl. ¶ 9); *see also* (Tr. 149:18–23 (Lubetzky, testifying) ("THE COURT: [Y]ou make a point that you have made repeatedly on the stand that your preference, for example, the typeface on the Kind snack wrapper is simple, clean, and modern.  THE WITNESS: Not just the type, but the design itself.")).  The philosophy of the KIND trade dress, as summarized by Mr.

Lubetzky, is as follows:  "we try to keep it simple and not use – not complicate things by graduations [sic], by textures, by wallpaper motifs, we try to keep it very, very clean."  (*Id.* 150:1–4).  The trade dress connects with core concepts underlying the KIND brand and communicates the integrity and simplicity of the product's ingredients.  *See, e.g.*, (*Id.* 38:5–7) (Lubetzky, testifying) ("At its core, the KIND brand[] is about transparency.  It's about simplicity.  It's about straightforwardness.  It's about saying more with less."); (Lubetzky Decl. ¶ 9) ("We designed a trade dress for KIND bars which would resonate with the core brand proposition (simple, whole ingredients you can see and pronounce) and which would convey a . . . sleek, and modern impression on store shelves.").  KIND achieves its look through the "straight line approach," (Tr. 118:10–12), described above.

The MOJO trade dress differs from the KIND trade dress in its color scheme, fonts, and number and placement of design elements.[5]  (Cleary Decl. ¶ 37); (Rosen Decl. ¶ 25).  In contrast

---

[5] A list of the specific differences include:

- Clif Bar uses its registered Clif design mark as a house mark, as well as its registered MOJO design mark; KIND uses the KIND design mark and no secondary mark.
- Clif Bar presents the Clif house mark vertically, on a red field on the far left corner of its package, while KIND presents its KIND house mark beneath four color panels on the right side of its packaging.
- Clif Bar uses the phrase "trail mix bar"; KIND has no comparable phrase.
- Clif Bar uses an arrow shaped banner behind the MOJO mark, and another slant-edged colored banner with the flavor description; KIND uses no similar banners.
- Clif Bar has chosen the color black as the background color for the MOJO line, across all flavors; KIND uses an array of colors as the background.
- Clif Bar's transparent window is to the right of its branding; KIND's transparent window is to the left of its branding.
- Clif Bar's transparent window is bisected by two adjacent, differently configured and colored banners on the upper third of the packaging; KIND's transparent window is bisected by a narrower continuous black horizontal stripe running roughly two-thirds of the way down the package.
- Clif Bar's arrow bullet points are on the left of the window; KIND's check-mark bullet points are to the right of its window.
- Clif Bar's product flavor descriptions are presented in the colored slant-edged banner to the right of its Clif MOJO banner; KIND's product flavor description is presented in the black bar to the left of its KIND design mark.
- KIND uses a metallic band on its packaging; Clif MOJO does not.
- The transparent window on the Clif MOJO packaging has a mountain displayed across the bottom; KIND does not have this motif.
- Clif MOJO uses a combination of gloss and matte packaging; KIND uses entirely gloss packaging.

to KIND's minimalist look, the MOJO trade dress has many embellishments.  And rather than an exclusive straight line approach, the MOJO dress combines straight lines with curves (e.g., in the large curved "J" of MOJO; the cursive font used to describe the product-line; and the mountain displayed along the bottom of the packaging).  *See, e.g.*, (Tr. 150:5–16 (Lubetzky, testifying) ("THE COURT: And you avoid curves.  THE WITNESS: Correct.  THE COURT: Now MoJo, the word 'MoJo' has both shading on the letters and, of course, the letter J is curved, and 'fruit and nut' are written in a script rather than a clean boxy typeface.  THE WITNESS: Correct.  THE COURT: It would seem that the 'MoJo' name and 'fruit and nut' writing would not be adopted by your company because neither is as clean -- THE WITNESS: I agree, your Honor.  THE COURT: -- as yours.")).  The MOJO trade dress with its arrow banner indicating movement and mountain imagery connects with the core concepts underlying the Clif Bar and MOJO brands—energy and outdoor adventure—concepts that are different from those underlying the KIND brand.  *See, e.g.*, (*Id.* 394:23–24 (Cleary, Testifying) ("[T]he core of [the MOJO] brand is to be energizing and moving people into motion.") [Dkt. No. 67]); (*Id.* 396:23–25 (Cleary, Testifying) ("[W]hat we were really trying to do here with the MoJo design was create a sense of energy that is flowing through the package . . . .")); (*Id.* 387:6–7 (Cleary, Testifying) ("[T]he Clif brand is about outdoors, it's about adventure . . . .")); (*Id.* 397:18–19 (Cleary, Testifying) ("[P]art of our heritage, a big part of it, is being in the  outdoors . . . .")).  In addition, the prominent use of the MOJO mark and the use of the Clif Bar mark, which has an 87% aided awareness, (*Id.* 388:12–19), tends to dispel any confusion as to the origin or

---

- KIND's flavors are always written in white font against a black background; Clif Bar's flavors are written in a different color that changes with each flavor.

(Cleary Decl. ¶ 37); (Rosen Decl. ¶ 25).  The Court basis its decision on the overall impression of the two trade dresses and not a side-by-side comparison.

sponsorship of the product.[6]  *See* (PX 83 (physical Clif MOJO Coconut Almond Peanut bar bearing MOJO and Clif Bar marks)).

### iii.    **Competitive Proximity**

This factor is not disputed.  Both products are healthy snack bars and compete in the same market.  This factor weighs in favor of Plaintiff.

### iv.    **Bridging the Gap**

"Because the parties in this case are already competitively proximate, there is no gap to bridge and so this factor is irrelevant."  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011) (Sweet, J.), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

### v.    **Actual Confusion**

Although evidence of actual confusion "is not necessary to show likelihood of confusion, its lack may under some circumstances be used against a plaintiff."  *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (internal citation omitted).  Such an inference is unjustified

---

[6] KIND argues that application of the *Bristol-Myers* rule is not appropriate here because (1) neither the KIND nor the Clif house marks constitute the most prominent feature of their respective trade dresses, (Post-Hrg. Mem. of Law in Supp. 15 [Dkt. No. 61]); (2) the KIND, Clif, and MOJO marks enjoy "nowhere near the almost-universal recognition of the brands 'Excedrin' and 'Tylenol,'" the brands discussed in *Bristol-Myers*, (*id.*); and, (3) the record demonstrates that many consumers are more likely to remember the KIND packaging than its name, (*id.*).  The Court disagrees.  First, it is not necessary to find that the marks are the most prominent features of the respective trade dresses in order to apply the *Bristol-Myers* rule.  *C.f. Conopco, Inc.*, 49 F. Supp. 2d at 250–51 (applying the *Bristol-Myers* rule, but not discussing whether the mark was the most prominent feature of the trade dress).  In any case, the KIND logo is one of the most prominent features of the KIND dress (the only more prominent feature is the transparent window) and, although KIND is correct that the Clif mark is not the most prominent feature of the MOJO trade dress, the MOJO mark is the second most prominent feature of the MOJO dress (after the transparent window).  Second, courts have applied the *Bristol-Myers* rule in cases concerning products that do not have "almost-universal" name recognition.  *See, e.g.*, *Nora Beverages, Inc.*, 164 F.3d at 744, App'x A. (2d Cir. 1998) (applying *Bristol-Myers* rule to the NAYA, Arrowhead, Poland Spring, and Zephyr Hills water bottles); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 455–56 (S.D.N.Y. 2000) (Sweet, J.) (applying *Bristol-Myers* rule to trade dress of Best Cellars and Grape Finds stores); *Conopco*, 49 F. Supp. 2d. at 250–51 (applying *Bristol-Myers* rule to ROMANCE and ETERNITY perfumes).  Third, although the Court notes that Mr. Lubetzky provided anecdotes of interactions he has had with consumers who know his product by its trade dress and not its name, Mr. Lubetzky did not testify that these consumers recognized KIND bars only through the six elements of the trade dress KIND seeks to protect here (and not, for example, the trade dress sought to be protected here *and* the four-colored panel KIND logo) and KIND provided no further evidence to support this claim.

when the allegedly infringing product is new to the market.  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  The Court finds that the evidence of actual confusion is weak.  This factor weighs slightly in favor of Plaintiff.

KIND presents both direct evidence and anecdotal evidence of actual confusion.  The direct evidence is a consumer survey conducted by George Mantis.  *See* (Mantis. Decl. [Dkt. No. 10]); (Mantis Reply Decl. [Dkt. No. 42]).  The anecdotal evidence consists of an observational study conducted by Sarah Butler, *see* (Butler Decl. [Dkt. No. 43]); (Butler Reply Decl. (PX 191)), a declaration of a potential consumer, *see* (Getz Decl. [Dkt. No. 44]), and social media posts, (PX 221).  Clif Bar offers a criticism of the Mantis and Butler surveys and a counter-survey by Dr. Michael Rappeport.  *See* (Rappeport Decl. [Dkt. No. 35]); (Rappeport Reply Decl. [Dkt. No. 56]).

The consumer survey conducted by Mr. Mantis found a 15% net confusion rate.  (Mantis Decl. ¶ 17).  Although case law indicates that a 15% net confusion rate may be sufficient to show actual confusion, *see, e.g.*, *Borghese Trademarks Inc. v. Borghese*, 10 Civ. 5552, 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (Oetken, J.), confusion rates of 15% are on the lower end of rates that courts within this Circuit have found sufficient to show actual confusion.  *See, e.g.*, *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 532, 535–36 (holding that surveys showing 27.8%, 22.5%, and 17.8% net confusion rates were sufficient to prove actual confusion); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 191 (S.D.N.Y. 2008) (Carter, J.) (34.5% and 47% net confusion sufficient to show actual confusion); *Energybrands, Inc. v. Beverage Marketing USA, Inc.*, 02 Civ. 3227, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (Rakoff, J.) (17% net consumer confusion sufficient to show actual confusion); *Masterfoods USA v. Arcor USA, Inc.*, 230 F. Supp. 2d 302, 311 (W.D.N.Y. 2002) (29.22% net confusion sufficient to show actual

confusion); *Volkswagen Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447, 1995 WL

605605, at *5 (S.D.N.Y. May 11, 1995) (Cote, J.) (17.2% and 15.8% net confusion sufficient to

prove actual confusion); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123,

131 (S.D.N.Y. 1993) (Leisure, J.) (26% net confusion sufficient to show actual confusion).[7]

In addition, Dr. Rappeport credibly testified that the Mantis survey was flawed because it

measured whether there was confusion, but not what *caused* the confusion.  (Tr. 226:7–10 [Dkt.

No. 65]).  As explained by Dr. Rappeport:

> [W]hen you have multi element trade dress, a key element . . . is that
> the multiple elements -- all of them . . . collectively could be causing
> the confusion or individual elements could be causing the confusion
> or maybe some combination of elements could be causing the
> confusion.  And the problem. . . is that [Mr. Mantis] doesn't address
> that because his control has none of the elements. So all he is
> measuring, all he possibly can measure is all or none; that is, either
> all the elements combined are causing the confusion or none. He has
> no way of measuring or seeing whether one or two elements of the
> trade dress are the ones causing the confusion and the others are
> simply superfluous . . .

(*Id.* 227:7–21).[8]  As a result, the survey may have underestimated the level of noise and thus

overestimated the level of actual confusion.  (Rappeport Decl. ¶¶ 5–6).

---

[7] In an effort to demonstrate that the 15% net confusion rate had "flown over the bar," (Tr. 562:2 [Dkt. No. 69]), KIND's counsel recounted the evolution of control methodologies, (Tr. 565:7–568:7), and emphasizes that "in the past, courts have found confusion rates in the 15% range, even where such rates reflected 'gross' rather than 'net' confusion."  (Post-Hrg. Mem. of Law. In Supp. 4).  The fact that in the past courts accepted gross confusion rates in the 15% range to be sufficient does not change the Court's analysis. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (4th ed. 2014) ("As courts have become more sophisticated in evaluating trademark survey results, judges have come to expect that a proper survey will have a control.").  Even KIND's counsel stressed that he was "not suggesting that we should go back to the bad old days."  (Tr. 567:12–13).

[8] In the Mantis survey, for each product shown, respondents were asked: "Do you think this brand of [snack bars] is or is not made by or made with the approval or sponsorship of the same company that makes the [corresponding type of product] you saw in the earlier photo?"  For respondents who answered in the affirmative, this question was followed by: "What makes you say that?" followed by "Anything else?"  (Mantis Decl. ¶ 14).  The verbatim responses to the "What makes you say that?" and "Anything else?" questions demonstrate that the survey shows that there was confusion, but not what caused the confusion.  For example, some responses cited the similar packaging, *see, e.g.*, (2,278,306 ("The package is similar."); 13,989,733 ("Looks like the same type [sic] wrapper."); 14,910,524 ("the package looks exactly the same as the kind bars I saw earlier.")), while other responses cited the similar flavors of the KIND and MOJO bars, *see, e.g.*, (4,357,938 ("They have the same flavors, and are both healthy snack bars."); 13,859,844 ("Fruit and nut was on most of the packaging with the exception of the chocolate bar I believe.  Looks like a higher quality of the same bars."); 15,276,734 ("flavors of the bars are exactly the

Because the Mantis survey shows only 15% net confusion, and in light of Dr. Rappeport's credible criticisms of the survey, and all other *Polaroid* and marketplace factors weighing in favor of Defendant, the Court gives little weight to the survey.  *See* 6 McCarthy on Trademarks and Unfair Competition § 32:188 (4th ed. 2014) (cautioning that "survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion").

Ms. Butler's anecdotal evidence of confusion consists of confusion in only one of the two customers who chose a MOJO bar.  That one consumer thought that the MOJO bar he had selected was a KIND bar.  (Butler Decl. ¶ 21).  However, the consumer replied, "no clue" to the interviewer's question, "What can you tell me about the energy bar you selected?"  (*Id.* Ex. D). In addition, he told the interviewer that he was looking for a KIND bar because his "[d]aughter told him to purchase it."  (*Id.*).  This does not demonstrate actual confusion because "the correct test is whether a consumer who is *somewhat familiar* with the plaintiff's [dress] would likely be confused when presented with defendant's [dress] alone."  *Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.*, 960 F. Supp. 673, 681 (S.D.N.Y. 1997) (Scheindlin, J.) (internal quotation marks omitted) (emphasis added).

In addition, Ms. Getz, a potential consumer who shares an apartment with a KIND employee, selected a MOJO bar, believing it to be a KIND bar, from a bowl of snacks in her

---

same."); 149,028,141 ("They had the exact same titles for each of the different bars.")), others cited both the packaging and similarity in flavors, *see, e.g.*, (14,551,199 ("Same packaging, which says fruit."); 15,456,620 ("The packaging looks very familiar and the flavors are very close to the same."); 149,079,722 ("The packaging and the flavors.")), and still others cited completely irrelevant considerations, *see, e.g.*, 2,959,724 ("These are very nice packages and I was looking for a special Valentine gift along these lines anyway, so it is exciting to encounter new products with better ingredients."); 10,955,032 ("I think this would be in every store and people would love to buy them.").  KIND argues that "Clif's arguments based on verbatim responses should be disregarded" because "Mr. Mantis testified that he did not base his opinion on the verbatim responses."  (Post-Hrg. Reply Mem. of Law in Supp. 5).  However, Mr. Mantis, in his report states clearly that, "[m]ost of these respondents specifically cited similarities in the trade dress as the basis of this mistaken belief," and goes on to highlight specific responses that indicated the packaging as the source of confusion.  (Mantis. Decl. ¶ 15).

apartment.  (Getz Decl. ¶¶ 4–8).  However, Ms. Getz's confusion may have resulted from her

expectation to find KIND bars in her home because of her roommate's employment at KIND.

*See* (*Id.* ¶ 3); (Tr. 421:1–12 ("Q. And does she from time to time bring home Kind bars from

work?  A. Yes, she does.  Q. And so do you frequently have Kind bars in your household?  A.

Yes, we do.  Q. And do you usually keep them in the fruit bowl that you mentioned earlier?  A.

She actually normally keeps boxes in her room.  She has put them in this bowl before, but she

puts other types of bars and granola bars in this bowl.  Q. But have Kind bars been in that bowl?

A. Yes, they have.")).  Ms. Getz's confusion is therefore not probative of the average consumer

in marketplace conditions.  *See, e.g.*, *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d

305, 327 (S.D.N.Y. 2000) (Sprizzo, J.), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne

Perfumes*, 234 F.3d 1262 (2d Cir. 2000) ("[T]he witnesses' reactions do not reflect the reactions

of an average consumer, because the witnesses' association with Paco Rabanne heightens their

sensitivity to the brand.").

  The social media posts KIND has submitted are mostly unhelpful.  (PX 221 Ex. A–D).

The comments on Clif Bar's Facebook posts note similarities between the MOJO bars and KIND

bars.  *See, e.g.*, (*Id.* Ex. A (comment on Clif Bar's Facebook post introducing two MOJO flavors

stating, "I love all things Clif and I'm sure I'll like these too, but don't they kinda look like Kind

bars?")).  However, "assertions of similarity . . . do nothing to establish consumer confusion that

enables a seller to pass off his goods as the goods of another, the definition of actual confusion

under the Lanham Act."  *Scholastic Inc. v. Speirs*, 28 F. Supp. 2d 862, 872 (S.D.N.Y. 1998)

(Mukasey, J.), *aff'd*, 199 F.3d 1323 (2d Cir. 1999) (internal quotation marks omitted); *see also

U.S. Shoe Corp. v. Brown Grp., Inc.*, 740 F. Supp. 196, 200 (S.D.N.Y. 1990) (Leval, J.), *aff'd*,

923 F.2d 844 (2d Cir. 1990) ("To say that defendant's ads remind consumers of plaintiff's ads is

very different from saying that they confuse consumers as to the source.").  KIND also submits a twitter post in which a twitter user wrote, "I was about to pick up one of those [MOJO bars] because I thought it was a Kind Bar at the vitamin shop . . . ."  (PX 221, Ex. D).  This type of initial interest confusion is actionable and therefore this post supports Plaintiff.  *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 n.2 (2d Cir. 2005) ("The Lanham Act protects against several types of consumer confusion, including . . . *initial interest* confusion and *post-sale* confusion . . . . " (internal citations omitted)).

Taken as a whole, KIND's evidence of actual confusion is weak; this factor weighs slightly in favor of Plaintiff.

### vi.    **Bad Faith**

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 388 (2d Cir. 2005).  The evidence presented by KIND does not demonstrate that Clif Bar adopted its new MOJO trade dress with the intent to deceive consumers into believing the MOJO bar was made or sponsored by KIND.  This factor weighs in favor of Defendant.

Although the evidence presented by KIND reveals that Clif Bar used the KIND trade dress as a model for its redesigned MOJO packaging, "[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."  *Streetwise Maps, Inc.*, 159 F.3d at 745.  The fact that the MOJO packaging prominently displays the MOJO mark and also displays the Clif mark, and uses a trade dress dissimilar to KIND's "minimalist" trade dress, negates an inference of intent to deceive consumers as to the source of the product.  *See, e.g., Nora Beverages, Inc.*, 269 F.3d at

125 ("[B]y placing its labels prominently upon its bottles, PGA negated an inference of intent to deceive consumers as to the source of its product.").

vii.   **Quality**

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (internal quotation marks omitted).  Because the Court lacks evidence about the quality of KIND and MOJO bars, this factor does not play into its analysis.

viii.   **Sophistication of Buyers**

When applying this factor, the court "must consider the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue."  *Streetwise Maps, Inc.*, 159 F.3d at 746.  "[T]he more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress . . . will result in confusion concerning the source or sponsorship of the product."  *Bristol-Myers Squibb Co.*, 973 F.2d at 1046.  "Generally, purchasers of small items . . . are considered casual purchasers prone to impulse buying."  *W.W.W. Pharm. Co., Inc. v. Gillette Co*., 984 F.2d 567, 575 (2d Cir. 1993).  Because the evidence presented to the Court supports both that some purchasers of healthy snack bars are casual purchasers and some are careful purchasers, the Court gives little weight to this factor in its analysis.

KIND argues that, "[r]elatively low-cost snack items, including KIND bars and MOJO bars (about $2 per bar), are often impulse purchases, placed near a store's checkout counter or at the end of aisles in grocery stores."  (Mem. of Law in Supp. 16).  Clif Bar disagrees, arguing that

21

KIND bars and MOJO bars "are premium snack foods sold at premium price."  (Mem. of Law in

Opp. 21).  Clif Bar asserts that purchasers of healthy snack foods "are well-educated, concerned

about the nutritional benefits and calorie counts of the bars they consume, and typically brand

loyal."  (*Id*.).

There is evidence on the record to support both positions.  KIND submitted data showing

that 47.9% of retail outlets that sell KIND bars sell them in a "primarily impulse" setting

(defined as convenience stores or "emerging channels"), supporting KIND's argument.  (PX

211).  However, Mr. Lubtezky testified that the "primarily impulse" setting is not where KIND

derives most of its sales volume, (Tr. 519:1–4), and KIND submitted a study that found that

77.3% of KIND's sales volume is generated by frequent purchasers (defined as those who eat

one bar or more a day or those who eat a bar several times a week), supporting Clif Bar's

argument.  (PX 199, at 11).   In addition, both CEOs testified that their respective brands enjoy

strong brand loyalty.  *See, e.g.*, (Tr. 388:12–19 (Cleary, testifying)); (*Id.* 514:16–17 (Lubetzky,

testifying)).

Because both arguments are supported by the evidence on the record, the Court finds that

some purchasers of healthy snack bars are likely to be casual purchasers prone to impulse

buying, while others are likely to be careful purchasers.  The Court therefore gives little weight

to this factor in its analysis.  *See, e.g.*, *Olay Co., Inc. v. Cococare Products, Inc.*, 81 Civ. 4102,

1983 WL 62351, at *13, *18 (S.D.N.Y. Apr. 19, 1983) (Sweet, J.) (giving sophistication of the

buyers factor "little weight in the analysis" because "[a]side from common knowledge, no

objective evidence was presented to bear on the length of the process by which the purchasing

decision is arrived at" and "the record shows that some consumers are careful purchasers of these

products while others are not").

ix. **Other Marketplace Factors**

Other marketplace factors weigh in favor of Clif Bar. The "caddies" or "inner cases" in which these products are often sold, and the point of sale displays Clif Bar has provided retailers, all prominently bear the MOJO and Clif marks, thus dispelling confusion as to the origin or sponsorship of the product. *See* (Cleary Decl. ¶¶ 51, 52). Also helping to dispel confusion is that many MOJO and Clif bars are sold through mass market and grocery stores, (*id.* ¶ 50); (Tr. 519:1–4 (Lubetzky, testifying)), where MOJO bars are often grouped with other Clif Bar products and KIND bars are often grouped with other KIND products, (Cleary Decl. ¶ 50).

x. **Balancing**

Balancing all of the *Polaroid* factors and the additional marketplace factors described above, the Court finds that Plaintiff has not demonstrated a likelihood of consumer confusion.

A. *Irreparable Harm*

KIND argues that if the Court "does not enjoin the new MOJO bar's trade dress, KIND will suffer real and irreparable harm in the form of lost goodwill and market share as customers are confused into buying MOJO bars when they mean to buy KIND bars." (Mem. of Law in Supp. 21–22). In light of the Court's finding that KIND has failed to establish likelihood of confusion, KIND's claim of potential lost goodwill and market share resulting from consumer confusion also fails.

B. *Alternate Standard*

Alternatively, the Court may issue a preliminary injunction if KIND can show that (1) sufficiently serious questions exist going to the merits of its case and that these questions are fair ground for litigation, and (2) the balance of hardships tips decidedly in its favor. *Christian*

*Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d at 215.  The Court finds that

KIND has failed to meet its burden, because the balance of hardships weighs in favor of Clif Bar.

Clif Bar alleges that its sunk costs for the new MOJO products totals approximately

$13.9 million, which includes Clif Bar's:

> inventory of products manufactured to date, which are in . . .
> warehouses and ready to ship; the value of inventory already
> shipped and at retail; . . . contracted ingredient and marketing
> commitments; R&D development costs; the cost of sales kits,
> merchandising shippers, plan-o-grams and reset work; and the
> forecasted loss of sales from Clif Bar products discontinued to
> make room for new CLIF MOJO products on the shelf.

(Cleary Decl. ¶ 55).  KIND's proposal to give Clif Bar a three-month period to sell off its

remaining inventory, (Tr. 593:23–594:1), would reduce its losses as to only the first category.

(Post-Hrg. Mem. of Law in Opp. 25 [Dkt. No. 72]).  In addition, Clif Bar estimates that it would

cost it approximately $500,000 and take eight months to develop and manufacture new

packaging.  (Cleary Decl. ¶ 57).  During that eight-month redesign period, Clif Bar estimates that

it would lose $10 million in revenue, (*id.*), and also lose a "window of opportunity to meet

consumer demand and develop brand loyalty."  (*Id.* ¶ 58).  Clif Bar alleges that it would also

suffer reputational harm due to its inability to fulfill commitments to the industry and consumers.

(*Id.*).

KIND argues that the $13.9 million figure fails to account for ingredients that could be

repurposed and includes product and flavor R&D, a cost which would not be lost by packaging

the MOJO bar in a different trade dress.  (Post-Hrg. Reply Mem. of Law in Supp. 9–10 [Dkt. No.

73]).  Mr. Lubetzky testified that, if needed, he could redesign the KIND trade dress in three

months' time.  (Tr. 504:2–6).  Even if KIND is correct that Clif Bar's losses are not as high as it

claims and that it could design new packaging in three months, it is KIND's burden to show that

the balance of hardships decidedly tips in its favor.  KIND has failed to do so.  KIND argues that

the balance of hardships weighs in its favor because if an injunction is not issued it "will suffer significant, irreparable harm."  (Mem. of Law in Supp. 23).  The irreparable harm is premised on KIND's alleged loss of goodwill and market share as consumers are confused into buying MOJO bars when they intend to buy KIND bars.  (*Id.* at 21–22).  As already discussed above, this argument fails in light of the Court's finding that KIND has not established a likelihood of consumer confusion.  Therefore, even if KIND is correct that Clif Bar's losses are not as high as it projects and that Clif Bar could redesign its trade dress in three months, the balance of hardships still tips in Clif Bar's favor.

### C.  *Public Interest*

KIND argues that the Court should issue a preliminary injunction because "[t]he public interest is served by preventing customer confusion or deception."  (*Id.* at 24).  In light of the Court's finding that KIND has failed to establish likelihood of consumer confusion, the Court finds that the public interest would not be served by issuing a preliminary injunction in this case.

### III.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiff's motion for a preliminary injunction.

SO ORDERED.

Dated: New York, New York
       June 12, 2014

_____/s/_____
Kimba M. Wood
United States District Judge